IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

VANNAK PRACH,

       Petitioner,              No. CIV S-08-2493 CHS P

   vs.

A. HEDGPATH,

       Respondent.          _____ORDER_____

_____/

## I.  INTRODUCTION

Petitioner Prach is a state prisoner proceeding pro se with an amended petition for writ of habeas corpus pursuant to 28 U.S.C. §2254.  Prach stands convicted of various crimes including conspiracy to commit first degree murder and first degree murder with various aggravating circumstances for which he is currently serving a sentence of life in prison, without the possibility of parole.  In the pending petition, Prach challenges the constitutionality of those convictions based on allegations of trial court error.

The petition, respondent's answer, and Prach's traverse are before the court.  The parties have consented to jurisdiction by a United States Magistrate Judge.  Based on a thorough review of the record and applicable law, the petition will is denied.

/////

1

II.  BACKGROUND[1]

Late on the night of February 20, 2005, several members of the Tiny Rascal Gangsters (TRG)[2] returned to the Stockton home of member Chan Hong after attending a party. Prach, an older documented member of TRG, was among the gang members who arrived at Hong's house.  They sat around in the garage playing video games and talking.  They discussed doing a drive-by shooting and catching someone "slippin'," meaning to go out and look for unprotected rival gang members who are out on the streets.  Prach said: "Let's roll."  Eight gang members left Hong's house in two vehicles.  Prach drove his silver mini-van and Hong followed, driving his green Camaro.

A little after midnight on the morning of February 21, Prach and Hong drove their vehicles to the Astor Drive area of north Stockton, an area claimed by the Asian Street Walkers (ASW) gang, an enemy gang to the TRG.  Prach and Hong drove past a young man, Nath Sok, on a bicycle.  Sok was a documented ASW gang member.  Prach and Hong made U-turns and came back to stop near Sok.  Prach said something casually to Sok, who responded more boisterously. Several men from the van and car got out.  A witness saw several of these men fire guns numerous times at Sok until Sok looked like a "pile of rags."  According to testimony they then calmly got back in their vehicles and cruised slowly away.  At about 12:30 a.m., Stockton police officers responded to a report of a shooting on Astor Drive. When they arrived, they found Sok lying dead on the lawn next to the bicycle. He had been shot in the neck, head, and groin. Six .40-caliber shell casings were found; five in the middle of the street and one on the sidewalk next

---

[1] This and other recitations of background facts herein are taken from the California Court of Appeal's opinion on direct review of Prach's conviction (*People v. Prach*, No. C055026, Cal. Ct. of App. Third District, April 10, 2008), with modifications and additions as appropriate.

[2] Gang expert Stockton Police Detective Kathyrn Nance testified TRG is a nationwide gang, the largest Southeast Asian gang in the United States. The color gray, as well as various symbols, are used by the TRG to represent the gang. TRG's primary activities are shootings, homicides, attempted homicides, assaults with deadly weapons, and shooting at houses. TRG members have been convicted of murder, attempted murder, shooting at inhabited dwellings, shooting from vehicles, possessing narcotics for sale, and stealing vehicles.

to the bike. Bullet holes were found in an adjacent house and carport, as well as in a bedroom wall inside the house.

Meanwhile, Prach drove his van to Jill Circle, another area of north Stockton. The Jill Circle area is known to be frequented by members of the Loc Town Crips (LTC) and Asian Boyz (ABZ), other enemies of the TRG.  Chhithdra Or, an LTC gang member, saw a van, later identified as Prach's van, slowly drive down the street.  Or saw the van's slider door open, revealing TRG gang member Reachhetra Pheng holding a gun.  Or saw sparks from the slider door of the van and Savoeun Yin, a documented member of the ABZ gang, whom Or had been talking to on the street a few minutes earlier, was shot.  Yin was shot in his hand, resulting in a crushed finger that had to be amputated, and in the scrotum, an injury that required him to learn to walk again.  The van drove off.

Cartridge cases found at Jill Circle and those from Astor Drive were examined and determined to have been fired from the same gun.  Police investigation led them to Hong and several of his TRG gang friends, who eventually identified Prach as the driver of the van involved in both shootings.  According to Detective Nance, the two shootings were done for the benefit of a criminal street gang.  Prach was a documented TRG member and according to Nance, he was an active member as of the date of the shootings.  Nance testified non-gang members would not be allowed to be involved in a drive-by shooting.  She also opined the driver has a very important role in a drive-by shooting.

At trial, Prach testified he was not the driver of his van that night.

Prach was convicted by jury of first degree murder, two counts of shooting a firearm from a motor vehicle, one count of shooting at an occupied dwelling, one count of conspiracy to commit murder, one count of attempted murder, and one count of being an active participant in a criminal street gang.  The jury also found true various allegations and special circumstances for sentence enhancement purposes.  Prach was sentenced to state prison for a life term, without the possibility of parole, on the first degree murder count and accompanying gang

special circumstance, in addition to other terms for other special circumstances found true.  On

direct appeal, the California Court of Appeal, Third District, affirmed the judgment and sentence

except that it struck of a criminal street gang enhancement and a parole revocation fine.

### III.  ISSUES FOR REVIEW

Prach contends that the following trial court errors deprived him of his rights

guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution:

(A) erroneous discharge of a holdout juror; (B) instructional error in response to a jury question;

and (C) erroneous refusal of a defense request for intoxication instructions.

### IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of

a state court can be granted only for violations of the Constitution or laws of the United States.

28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*

*Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)).

Additionally, this petition for writ of habeas corpus was filed after the effective date of, and thus

is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v.*

*Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999).

Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits

in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v.*

*Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

This court looks to the last reasoned state court decision in determining whether the law applied

to a particular claim by the state courts was contrary to the law set forth in the cases of the United

4

States Supreme Court or whether an unreasonable application of such law has occurred. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), *cert. dismissed*, 538 U.S. 919 (2003).

V.  DISCUSSION

A.      Discharged Juror

1.      Background

The jury began deliberating on the afternoon of December 12, 2006, and continued on December 13, 14, 15, 19, and 20.  They periodically asked questions, requested read back of testimony, and to review videotape exhibits.

On the morning of December 21, the jury foreperson passed the trial court a note asking to speak with the court privately.  The court and the parties met with the foreperson outside the presence of the rest of the jury.  The foreperson described a problem with Juror No. 4. According to the foreperson, Juror No. 4 "started out our deliberations the very first day, when she walked in, she said, 'I beat the IRS and all their lawyers.  I beat seven lawyers and took all my grandchildren away from my alcoholic children.  And you don't fuck with this bitch.'"  Juror No. 4 made the statement in a bragging fashion.  The foreperson said: "She is bipolar, we believe. We believe that she's psychotic.  She jumps up and down.  She screams at everybody. She will go off into the bathroom and stay there for several minutes.  And then she'll turn around and just smile sweetly as if nothing happened.  [¶]  She told us in the beginning that, 'This is my opinion and nothing you say can change my mind.  You can talk until you're blue in the face, but nothing will change my mind.'  [¶]  We've spent all of this time showing her evidence after evidence.  It's been eleven jurors to this one person.  And people have been patient.  Nobody has been yelling, nobody has been swearing, except this one person.  [¶]  And, I'm not bringing this to the Court because I differ with her opinion.  I'm bringing this to the Court because of her temper tantrums and because of- of the way that she's treating other jurors.  She threatened this morning to change-she's actually threatened that, 'I will change everything else that we've done.' She said, 'I will call in sick and let you get another juror and start all over again with an

alternate.' She's made several threats of this type.  [¶]  I don't know where to go from here."

When asked by the trial court if Juror No. 4 had participated in deliberations, the foreperson responded: "She doesn't participate.  What she does is she sits there and listens and doesn't say a word.  Then when she talks and people raise their hands to respond, she shuts everybody off and she yells at them and said [*sic*], 'Now I've sat here and listened to you, so you sit and listen to me.'  And then she made the statement, she said, 'This is what I feel and I don't want any response from anybody.  This is what I feel.  And there's-and there's nothing you can say to change my mind.'"  She never considers other viewpoints.

The foreperson revealed the jury had reached verdicts on all but one count and that the foreperson had signed the verdict forms on the agreed counts in the presence of all of the jurors.  Now Juror No. 4 was threatening to go back on those counts.  According to the foreperson, "this morning it was really ugly.  She just started yelling.  And-and I'm a pretty calm person and I finally just sat up and I said, 'Would you please lower your voice, there's no need to be shouting at people.'  [¶]  And then she started yelling again that, 'I won't take these personal attacks.'  And there are not personal attacks, we are just trying to get her to listen to the evidence that the other eleven jurors can see."

The foreperson was excused and the court discussed the situation with the parties.  The prosecutor commented that Juror No. 4 had not disclosed on her jury questionnaire any of her prior experiences with lawyers.  Defense counsel noted the questionnaire asked: "Have you ever had a bad experience with any type of attorney?"  Since Juror No. 4 claimed to have beaten the attorneys in the matters she brought up, defense counsel thought she might have considered her prior experiences as a good experience with attorneys.  The parties and court agreed each juror should be questioned individually and privately.

Juror No. 1 indicated Juror No. 4 was being "very inconsistent."  She went "from one extreme to another emotionally."  She was "very angry" and "not willing to work with us."  The court pointed out there is a difference between someone who may not agree with other

people's opinions and someone who is not willing to engage in discussion about it.  Juror No. 1 stated Juror No. 4 was not willing to discuss it.

Juror No. 2 described Juror No. 4 as "irrational."  She has "temper tantrums, three, four times a day."  Juror No. 2 felt Juror No. 4 had a "hidden agenda."  Juror No. 4 would not tie her opinions to the evidence.

Juror No. 3 thought Juror No. 4 was going from her personal thoughts, not the evidence. According to Juror No. 3, Juror No. 4 stands up and screams.  Everybody tries to calm her down, but she won't calm down.  Juror No. 3 felt Juror No. 4 was participating in deliberation "to a certain point, and then we came to this point now."

When she was questioned, Juror No. 4 felt she was following the court's instructions to talk and deliberate, but to decide the case for yourself. She had "given her points and we are just in disagreement."  She suggested she was being personally attacked in deliberations and was suffering from physical effects of the stress.  When the trial court brought up Juror No. 4's jury questionnaire and whether she had prior dealings with attorneys or the court system, Juror No. 4 said she did when she was trying to get custody of her grandchildren, but the district attorney was not involved.  Juror No. 4 represented she would be able to participate in deliberations with the other jurors.  After Juror No. 4 left the room, the trial court noted for the record that she had become visibly upset during questioning, had started crying, and that the bailiff had provided her with tissues.

Juror No. 5 said Juror No. 4 was "not even considering, talking, looking, or going over [the evidence] again. It's just what she thinks and that's it."  As one of the undecided, Juror No. 5 had made a list to help Juror No. 4 with her areas of uncertainty.  Juror No. 5 suggested to Juror No. 4 that she needed to see why she was unsure.  Then they could go back to consider the evidence.  But Juror No. 4 kept saying "it doesn't matter."  She was not willing to look at the evidence. She did not want to work anymore.

/////

Juror No. 6 stated Juror No. 4 was very emotional and was basing her decisions on assumptions. She was not willing to look at the evidence. The jury had tried different approaches, at one point going around the table to give reasons for their decisions. When they came to Juror No. 4, she became confrontational and accused them of attacking her. She shut down and refused to talk about it.

Juror No. 7 noted that on the first day of deliberations, as they were walking in, Juror No. 4 made an announcement to the rest of the jury.  Juror No. 7 sat next to her to act as a calming presence, but Juror No. 4 went from highs to lows, screaming to crying, temper tantrums.  Juror No. 7 said she felt Juror No. 4 exhibited very "manipulative behavior," that she has "an agenda to get her way no matter what."  Juror No. 7 felt Juror No. 4 was "trying to manipulate the process."  Juror No. 7 gave an example.  A few days earlier Juror No. 4 wanted to be out by noon in order to do some Christmas shopping.  In light of that, she made some suggestions that the other jurors went along with, but when they were stuck on one point, she took the attitude that "I did all of this for you, you need to do this for me."  Juror No. 7 felt it should not be about "give and take," but about looking at the evidence.  Juror No. 7 said Juror No. 4 had always participated in deliberations, but when she states a fact, she won't let anyone question or present another side of it.  Once she states her view, she doesn't want to talk about it. She doesn't want to participate. Juror No. 7 felt Juror No. 4 was refusing to deliberate.

Juror No. 9 indicated Juror No. 4 was discussing some of the evidence.  She was, however, too emotional and did not treat the other jurors with respect.  She did not seem able to back up her views with evidence.

Juror No. 10 felt that Juror No. 4 had no intention from the beginning to deliberate at all.  When the jury was discussing things as a group, Juror No. 4 would turn her head and want no part of it.  Juror No. 4 used foul language and threatened if they did not do what she wanted, she would change her vote on matters they had already decided.  She told them when she got back in her seat, she would tell the judge she had changed her vote.

Juror No. 11 felt it was like being at a family gathering and one member of the family "wants to play the crazy hand." Juror No. 11 felt Juror No. 4 had both short-term and long-term memory problems. According to Juror No. 11, Juror No. 4 "never had an open mind, ever." Although Juror No. 4 would participate in some discussions, Juror No. 11 felt there was "something outside ... this case" that had made Juror No. 4 sympathetic to one side. At this point, Juror No. 4 was not willing to deliberate.

Juror No. 12 said Juror No. 4 wanted the rest of the jurors to accept her opinion without being willing to explain why she feels that way or what evidence she is basing her view on. She was not exchanging thoughts and looking at the evidence, she was yelling, cussing, and having temper tantrums. She showed no willingness to discuss the evidence. Right from the beginning Juror No. 4 stated her opinion and told them she would not change her mind. Although there were a few days when she initially participated in discussions, the last few days she had been unwilling to do so.

After hearing from all the jurors and discussing the situation with the parties, the trial court decided, over defense objection, to replace Juror No. 4 with an alternate, pursuant to Cal. Penal Code §1089.[3] The trial court found Juror No. 4 was not "deliberating in a meaningful manner with her fellow jurors." The trial court added, "as a side reason, [its] discomfort with [Juror No. 4] not being completely candid in her questionnaire, combined with the statements about the grandchildren, and Government attorneys, and so forth." While "that alone would not be enough [,]" it was a factor the court considered in combination with her refusal to meaningfully deliberate.

/////

---

[3] Under section 1089, "[I]f at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors."

2.      Analysis

Renewing the claim he made on direct appeal, Prach argues that in replacing Juror. No. 4 with an alternate, the trial court erroneously dismissed a "hold-out" juror.  Prach argues that the trial court erred in discharging Juror No. 4 because the evidence does not support a finding that Juror No. 4 refused to deliberate.  Rather, Prach asserts, she simply disagreed with the other jurors on the one remaining count for which they had not reached a unanimous verdict.

The state appellate court rejected Prach's claim, holding "the record supports the trial court's conclusion here that Juror No. 4 refused to deliberate and therefore, the trial court did not abuse its discretion in discharging her and replacing her with an alternate." (*People v. Prach*, slip op. at 14.)  This conclusion is not contrary to, or an unreasonable application of clearly established federal law, nor based on an unreasonable determination of the facts in light of the evidence.

First, to the extent Prach's claim is based on a theory that dismissal of Juror No. 4 violated his right to a unanimous jury verdict under either the Fifth or Sixth Amendments to the United States Constitution, the claim fails.  Neither the Due Process Clause of the Fifth Amendment, nor the Sixth Amendment's right to trial by jury require unanimous jury verdicts in state criminal trials.  *See Johnson v. Louisiana*, 406 U.S. 356 (1972); *Apodaca v. Oregon*, 406 U.S. 404 (1972).

The Sixth Amendment also encompasses a right to a fair and impartial jury. *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968).  This right applies to criminal defendants in state court, through application of the Fourteenth Amendment.  *See Willams v. Florida*, 399 U.S. 78, 86 (1970).  Federal law clearly establishes that a criminal defendant's Sixth Amendment right to a fair jury trial is violated if the "essential feature" of the jury is not preserved.  *See Williams*, 399 U.S. at 100.

California law allows a trial court to remove a juror from service if the juror becomes ill, dies, or is "unable to perform his or her duty."  Cal. Penal Code § 1089.  A juror

1  who refuses to follow the court's instructions is "unable to perform his duty" within the meaning

2  of this section 1089.  *People v. Williams*, 25 Cal.4th 441, 448 (2001).  The Ninth Circuit Court of

3  Appeals has upheld the constitutionality of section 1089, determining that it "preserved the

4  'essential feature' of the jury required by the Sixth and Fourteenth Amendments."  *Miller v.*

5  *Stagner*, 757 F.2d 988, 995 (9th Cir. 1985), *amended by* 768 F.2d 1090 (9th Cir. 1985) (citing

6  *Williams v. Florida*, 399 U.S. 78, 100 (1970) and *Henderson v. Lane*, 613 F.2d 175, 177 (7th Cir.

7  1980), *cert. denied*, 446 U.S. 986 (1980)).

8          Even assuming the facial validity of section 1089, the question remains whether it

9  was applied in an unconstitutional manner in Prach's case  *See Perez v. Marshall*, 119 F.3d 1422,

10  1426 (9th Cir. 1997) ("Because we decided in *Miller* that section 1089 is facially valid under the

11  Sixth Amendment, we need only decide whether its application in the circumstances of this case

12  violated [petitioner's] Sixth Amendment rights."), *cert. denied*, 522 U.S. 1096 (1998).  Whether

13  a trial court violates a defendant's Sixth Amendment right to a fair jury trial by excusing a juror

14  for good cause and replacing that juror with an alternate is a question of law.  *Id*.  The fact that a

15  state trial judge knew that a juror was the lone holdout does not, by itself, invalidate the trial

16  judge's decision to excuse the juror for cause.  *See Perez*, 119 F.3d at 1427.

17          "A trial court may not remove a juror to accommodate the prosecution's desire to

18  exercise a peremptory challenge after a jury has been impaneled."  *Sanders v. Lamarque*, 357

19  F.3d 943, 944 (citing *McDonough Power Equip. Inc. v. Greenwood*, 464 U.S. 548, 555 (1984)).

20  This is true even if the juror was dishonest in answering voir dire questions, so long as there is no

21  actual or implied bias on the part of the juror.  *See Id*. at 948-49.  In this case, however, the trial

22  judge clearly indicated that Juror 4's failure to be "completely candid" in her juror questionnaire

23  was only a "side reason" for her dismissal which was not sufficient on its own.  The trial judge

24  expressly stated that he considered this factor only in combination with the ultimate reason for

25  dismissal: that Juror No. 4 refused to deliberate in meaningful manner with other jurors.

26  /////

1          A thorough search reveals no Supreme Court precedent addressing whether

2    dismissal of a juror who refuses to deliberate violate's a criminal defendant's Sixth Amendment

3    right to a fair and impartial jury trial.  Prach's claim is therefore rejected under section

4    2254(d)(1).  *See Carey v. Musladin*, 549 U.S. 70 (2006) (holding that a state court cannot be said

5    to have unreasonably applied clearly established Federal law under section 2254(d)(1) when there

6    are no holdings from the Supreme Court addressing the issue raised by the petitioner).

7          Relief is likewise foreclosed under section 2254(d)(2).  "[A] decision adjudicated

8    on the merits by a state court and based on a factual determination will not be overturned on

9    factual grounds unless objectively unreasonable in light of the evidence presented in the state-

10   court proceeding." *Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004) (citing §2254(d)(2)).

11         According to Prach, Juror No. 4 had participated in deliberation and simply did

12   not believe the prosecution had met its burden to prove the charges on one count.  Prach's

13   argument fails, however, in light of the evidence presented in state court.  Record evidence

14   shows that the other jurors consistently reported that Juror No. 4 had refused to engage in

15   deliberations, which appeared to have become worse as deliberations went on.  It was also the

16   general consensus of the other jury members that Juror No. 4 had separated herself from the jury,

17   repeatedly stated that she had her mind made up, and indicated that there was no point in

18   discussing the evidence.  The trial judge spoke to Juror No. 4 and observed her demeanor when

19   asked whether she was deliberating and could continue to deliberate.  It was reported that Juror

20   No. 4 inappropriately tried to bargain her vote on some counts in exchange for agreement by the

21   rest of the jurors on something she wanted.  It was further reported that Juror No. 4 threw temper

22   tantrums, used foul language, and threatened to change her vote on matters already decided.  It

23   was only after extensive and careful inquiry that the trial court concluded Juror No. 4 was

24   refusing to engage in meaningful deliberations.  Juror No. 4's reported behavior went far beyond

25   merely being difficult or coming to a point where further discussion simply could not alter her

26   opinion of the evidence.  The record supports the trial judge's determination that Juror No. 4

refused to deliberate, and the state appellate court's decision affirming that ruling cannot be said

to be objectively unreasonable.

In sum, the state court neither unreasonably applied clearly established Federal

law, nor unreasonably determined that Juror No. 4 refused to deliberate.  Accordingly, Prach is

not entitled to relief for this claim.

B.      Response to Jury Question on Premeditation

1.      Background

At trial, the prosecution proceeded under a theory that Prach originally intended to

aid and abet the commission of either shooting from a motor vehicle or a lesser included offense.

The jury was instructed that one who aids and abets is equally guilty of the crime committed, and

that one who aids and abets may under some circumstances also be found guilty of other crimes

that occurred during commission of the first crime:

> The defendant is guilty of murder and attempted murder if the
> People have proved that the defendant aided and abetted either
> shooting from a motor vehicle or a lesser included offense and that
> murder and attempted murder was the natural and probable
> consequence [thereof]...

(RT at 2065.)

> A natural and probable consequence is one that a reasonable person
> would know is likely to happen if nothing unusual intervenes.  In
> deciding whether a consequence is natural and probable, consider
> all of the circumstances established by the evidence.  If the murder
> and attempted murder was committed [sic] for a reason
> independent of the common plan to commit the shooting from a
> motor vehicle or the lesser included offense, then the commission
> of murder and attempted murder was not a natural and probable
> consequence of shooting from a motor vehicle or the lesser
> included offense.

(RT at 2065.)

The jury was further instructed with CALCRIM Nos. 401 and 521 as follows:

> To prove that the defendant is guilty of a crime based on aiding and
> abetting the crime, the People must prove that: [¶] One, the
> perpetrator committed the crime; [¶] Two, the defendant knew that

13

1
      the perpetrator committed the crime; [¶] Three before or during
commission of the crime, the defendant intended to aid and abet
2
the perpetrator in committing the crime; [¶] And, four, the
defendant's words or conduct did in fact aid and abet the
3
perpetrator's commission of the crime. [¶] Someone aids and abets
a crime if he knows of the perpetrator's unlawful purpose and he
4
specifically intends to, and does in fact, aid, facilitate, promote,
encourage, or instigate the perpetrator's commission of that
5
crime...

6
(RT at 2056-57 (CALCRIM No. 401).)

7
      If you decide that the defendant has committed murder, you must
decide whether it is murder of the first or second degree. [¶] The
8
defendant is guilty of first degree murder if the People have proved
that he acted willfully, deliberately, and with premeditation. The
9
defendant acted willfully if he intended to kill. The defendant acted
deliberately if he carefully weighed the considerations for and
10
against his choice and, knowing the consequences, decided to kill.
The defendant acted with premeditation if he decided to kill before
11
committing the act that caused death. [¶] The length of time the
person spends considering whether to kill does not alone determine
12
whether the killing is deliberate and premeditated. The amount of
time required for deliberation and premeditation may vary from
13
person to person and according to the circumstances. A decision to
kill made rashly, impulsively, or without careful consideration is
14
not deliberate and premeditated. On the other hand, a cold,
calculated decision to kill can be reached quickly. The test is the
15
extent of the reflection, not the length of time. [¶] All other
murders are of the second degree. [¶] The People have the burden
16
of proving beyond a reasonable doubt that the killing was first
degree murder rather than a lesser crime. If the People have not
17
met this burden, you must find the defendant not guilty of first
degree murder.

18

19
(RT at 2059-60 (CALCRIM No. 521).)

20
      On the sixth day of deliberations, the jury sent the trial court the following

21
question:  "In trying to decide on 1st or 2nd degree murder, do we consider the premeditation on

22
the part of Vannak Prach alone or is it decided by the premeditation of the gang/ its members/ or

23
individuals in the gang activity in question? (Count 1 [the charge of murder])"

24
      The court and parties discussed at length what would be an appropriate response

25
to the jury's question.  The prosecutor took the position that "under a straight aiding and abetting

26
theory," the aider and abettor must share the requisite specific intent with the perpetrator, but

14

under a natural and probable consequences theory of aiding and abetting, only the perpetrator
needed to harbor premeditation.  Defense counsel contended the intent of both defendant and the
perpetrator were relevant.  Defense counsel asked the court to refer the jury to Judicial Council of
California Criminal Jury Instructions (2007-2008), CALCRIM No. 401 ("Aiding and Abetting:
Intended Crimes"), CALCRIM No. 521 ("Murder: Degrees") and CALCRIM No. 522
("Provocation: Effect on Degree of Murder") as it had been modified for this case.[4]

       The court did not feel CALCRIM No. 522 dealing with provocation was
responsive to the jury's question. The trial court felt it was only defendant's state of mind, his
premeditation or lack of premeditation, which was relevant.  The prosecution suggested the court
simply refer the jury back to CALCRIM No. 521 and CALCRIM No. 401.  Defense counsel
again asked the court to add CALCRIM No. 522 regarding provocation, but expressed
satisfaction with a referral to CALCRIM No. 521 alone.  The prosecution still wanted CALCRIM
No. 401 included.  Defense counsel then agreed the jury could also be referred to CALCRIM No.
401, but once more suggested CALCRIM No. 522 regarding provocation be added.  The trial
court settled on the following answer to the jury's question: "Please refer to jury instructions #
521 and # 401, as well as any other instructions you think are applicable."

       2.    Analysis

       Prach claims, as he did on direct appeal, that the trial court "erroneously failed to
clarify the premeditation instructions."  He argues that the trial court's response directing the
jurors only to instructions already given was inadequate in light of their expressed confusion.

       On direct appeal, the state appellate court rejected Prach's claim, finding no
prejudice from the trial court's response:

---

[4] CALCRIM No. 522, as modified and given to the jury, stated: "Provocation may reduce
a murder from first degree to second degree and may reduce a murder to manslaughter. The
weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that
a perpetrator committed murder but was provoked, consider the provocation in deciding whether
the crime was first or second degree murder. Also, consider the provocation in deciding whether
a perpetrator committed murder or manslaughter."

The prosecution proceeded under a direct theory of aiding and abetting, that is, when defendant and the other TRG gang members discussed going out to catch someone "slippin," defendant and the others specifically went out looking for a rival gang member with the intent to kill that person. As our Supreme Court has explained, under this theory of aiding and abetting, "an aider and abettor's mental state must be at least that required of the direct perpetrator. 'To prove that a defendant is an accomplice... the prosecution must show that the defendant acted "with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." [Citation.] When the offense charged is a specific intent crime, the accomplice must "share the specific intent of the perpetrator"; this occurs when the accomplice "knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." [Citation.]' [Citation.] What this means here, when the charged offense and the intended offense-murder or attempted murder-are the same, i.e., when guilt does not depend on the natural and probable consequences doctrine, is that the aider and abettor must know and share the murderous intent of the actual perpetrator." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118.) By referring the jury to CALCRIM Nos. 401 and 521, the trial court adequately addressed the intent required for first degree murder under this theory of aider and abettor liability.

The prosecution, however, also proceeded under a natural and probable consequences theory of aiding and abetting, that is, when defendant and the other TRG gang members discussed going out to catch "someone slippin," defendant and the others at least intended to commit the crime of shooting from a motor vehicle or its lesser included offense of assault with a firearm. The jury was instructed with CALCRIM No. 402 (Natural and Probable Consequences Doctrine (Target and Non-Target Offenses Charged)) specifically identifying such offenses as possible uncharged target crimes. If the jury concluded defendant aided and abetted only such uncharged target crimes and a murder resulted, defendant would have derivative liability for such murder if the murder was a natural and probable consequence of the commission of the target offense. (*People v. Prettyman* (1996) 14 Cal.4th 248, 260; *People v. Beeman* (1984) 35 Cal.3d 547, 560; see *People v. McCoy, supra,* 25 Cal.4th 1111, 1117.)

To determine if defendant was responsible for a first degree murder under this theory of aiding and abetting, the jury would have had to decide both that a first degree murder was committed and that first degree murder was a natural and probable consequence of aiding and abetting the uncharged target crimes under the circumstances of this case. (See *People v. Prettyman, supra,* 14 Cal.4th at pp.

262, 267; *People v. Woods* (1992) 8 Cal.App.4th 1570, 1577-1578.) To decide the first question-whether the murder committed by the perpetrator was a first degree murder, the jury would have had to consider the perpetrator's specific intent, not because defendant was vicariously liable for such intent per se, but because a defendant becomes responsible under the natural and probable consequences theory of aiding and abetting for the crime actually committed by the perpetrator if such crime was a reasonably foreseeable consequence of aiding and abetting the target offense. (See *People v. Perez* (2005) 35 Cal.4th 1219, 1225-1226; *People v. Prettyman, supra,* at pp. 262, 267; see also *People v.. Mendoza* (1998) 18 Cal.4th 1114, 1133.) The nature and degree of the crime committed by the perpetrator must be determined before the extent of defendant's liability for his own intent and acts in aiding and abetting the uncharged target offense can be determined.

The trial court's referral of the jury to CALCRIM Nos. 401 and 521, and generically to any other instruction the jury felt was appropriate, was an incomplete response to the jury's question regarding whose premeditation should be considered if the jury was considering liability under the natural and probable consequences theory of aider and abettor liability. However, any error benefitted defendant because the reference of the jury to only defendant's intent to aid and abet (CALCRIM No. 401) and defendant's deliberation and premeditation (CALCRIM No. 521) limited the jury's consideration to the prosecution's direct aider and abettor's theory of liability. The response did not allow the jury to consider any other person's premeditation.

Moreover, it is clear from the jury's verdict that the jury found defendant had the specific intent to commit premeditated and deliberated first degree murder when it found defendant guilty of conspiracy to commit murder. "[W]here two or more persons conspire to commit murder-i.e., intend to agree or conspire, further intend to commit the target offense of murder, and perform one or more overt acts in furtherance of the planned murder-each has acted with a state of mind 'functionally indistinguishable from the mental state of premeditating the target offense of murder.' [Citation.] The mental state required for conviction of *conspiracy* to commit murder necessarily establishes premeditation and deliberation of the target offense of murder-hence all murder conspiracies are conspiracies to commit first degree murder..." (*People v. Cortez* (1998) 18 Cal.4th 1223, 1232.) In such circumstance, any error in the trial court's response to the jury's question was harmless.

(*People v. Prach*, slip op. at 25-29.)

A claim of instructional error does not raise a cognizable federal claim, unless the error "so infected the entire trial that the resulting conviction violates due process." *Estelle v.*

1   *McGuire*, 502 U.S. 62, 71-72, (1991); *see also Henderson v. Kibbe*, 431 U.S. 145, 154 (1977);

2   *Cupp v. Nauhten*, 414 U.S. 141, 146-47 (1973).  "[N]ot every ambiguity, inconsistency, or

3   deficiency in a jury instruction rises to the level of a due process violation."  *Id*.  The issue must

4   be considered in the context of the instructions and the trial record as a whole.  *Estelle*, 502 U.S.

5   at 72; *Boyde v. California*, 494 U.S. 370, 378 (1990).  In the case of an ambiguous instruction,

6   the relevant question is whether there is a reasonable likelihood that the jury applied the

7   challenged instruction in a manner that violates the Constitution.  *Estelle*, 502 U.S. at 63 (citing

8   *Boyde*, 494 U.S. at 380).  If an error is found, relief is only available if the error had a substantial

9   and injurious effect or influence in determining the jury's verdict.  *Brecht v. Abrahamson*, 507

10   U.S. 619, 637 (1993).

11       With regard to jury questions, "[w]hen a jury makes explicit its difficulties a trial

12   judge should clear them away with concrete accuracy."  *Bollenbach v. United States*, 326 U.S.

13   607, 612-13 (1946); *see also Weeks v. Angelone*, 528 U.S. 225 (2000).  A jury is presumed to

14   understand a judge's answer to a question.  *Weeks*, 528 U.S. at 234; *but see United States v.

15   Frega*, 179 F.3d 793, 808-11 (9th Cir. 1999) (trial judge's confusing response to jury's questions

16   raised possibility that verdict was based on conduct legally inadequate to support conviction).  In

17   *Weeks*, the United States Supreme Court "noted that the original instruction was correct and that

18   the judge directed the jury to the precise paragraph that answered the question clearly.  This was

19   sufficient to pass constitutional muster..." *Beardslee v. Woodford*, 358 F.3d 560, 574-75 (9th

20   Cir. 2004) (citing *Weeks*, 528 U.S. at 234).  *Cf. Beardslee v. Woodford*, 358 F.3d at 575

21   (harmless due process violation occurred when, in responding to jury's request for clarification,

22   court refused to give clarification and informed that no clarifying instruction would be given).

23       Here, the state appellate court concluded that the trial court's response to the

24   jury's question about premeditation was incomplete, but that the error served to benefit Prach.

25   Importantly, contrary to Prach's argument, there is no danger that the jury convicted him of first

26   degree murder based "on vicarious liability for the intent of a co-defendant or some other third

party who played no role in the charged offense."  The court's response to the jury's question, by reference to CALCRIM Nos. 401 and 521, specifically directed the jury to consider Prach's premeditation.  There is no indication that the jury applied any of the instructions in an unconstitutional manner.  It is further presumed that the jury followed their instructions.  *See generally Greer v. Miller*, 483 U.S. 756, 766 (1987).  Prach points to no instructions that allowed the jury to convict him of first degree murder on an improper theory of vicarious liability based only on the intent of another person.  Pure speculation that the jury might have misunderstood or misapplied instructions will not suffice for habeas corpus relief.  *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) (conclusory allegations lacking in factual support do not provide a sufficient basis for habeas corpus relief).  Moreover, the jury found Prach guilty on the conspiracy to commit murder count, a finding which demonstrates its conclusion that Prach had the specific intent required for a first degree murder conviction.

For all these reasons, the state court's finding of no prejudice is consistent with the *Brecht* harmless error analysis which must be applied on federal habeas corpus review.  507 U.S. at 637.  Prach is not entitled to relief for this claim.

C.     Intoxication Instructions

1.     Background

TRG gang members Sovanara Chan and Reachhetra Pheng were shooters in the incident on Astor Drive that resulted in the death of Sok.

Chan testified he drank a large quantity of beer over the course of the afternoon and night of the shooting.  He drank two cans of beer during the three to four hour period of time he was at a party before returning to Hong's garage.  He testified he could tell he was affected by the alcohol because he could not play video games as well as usual.  Chan testified the shooting occurred probably 40 minutes after his last beer, although he thought he was still drunk.

Pheng testified in his own trial, introduced as former testimony in Prach's trial, that he drank two 40-ounce beers, plus a couple of cans of beer, the night of the shooting.  Pheng

1   said he was drunk when he was riding in Prach's van after they left Hong's garage. He admitted

2   he knew what was going on, but also stated he thought they were "going to play pool or

3   something.  I didn't know-it was just like everything just happened."

4          Based on this evidence, Prach requested that the trial court give voluntary

5   intoxication instructions in connection with the prosecution's natural and probable consequences

6   theory of aiding and abetting.  Finding that it was only Prach's state of mind, not the

7   perpetrator's, that was relevant, the trial court declined to give CALCRIM Nos. 625 and 3426.

8                                    2.      Analysis

9          Prach claims that the trial court erroneously refused the defense's request for

10  instructions on voluntary intoxication in connection with the prosecution's natural and probable

11  consequences theory of aiding and abetting.

12         On direct appeal, the state court did not address the propriety of the trial court's

13  ruling that the instructions were unwarranted, instead concluding simply that "any error was

14  harmless."  The state court explained:

15               It is clear from the jury's verdict of guilt on the charge of
                 conspiracy to commit murder that the jury found defendant had a
16               specific premeditated intent to kill (*People v. Cortez, supra,* 18
                 Cal.4th at p. 1232), i.e., the jury did not use the natural and
17               probable consequences theory of aiding and abetting, but found
                 defendant guilty on a direct theory of aiding and abetting the
18               charged offense-murder. Thus, any error by the trial court here in
                 refusing defendant's request for voluntary intoxication instructions
19               tailored to relate to the perpetrators' intoxication was harmless
                 under any standard.
20

21  (*People v. Prach*, slip op. at 34-35.)

22         "It is well established that a criminal defendant is entitled to adequate instructions

23  on the defense theory of the case[,] ...provided that it is supported by law and has some

24  foundation in the evidence."  *Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 1999) (internal citation

25  omitted).  Once again, however, Prach's claim is foreclosed because the state court's rejection of

26  the claim on the basis that no prejudice ensued is not an unreasonable application of clearly

1    established federal law, nor based on an unreasonable determination of the facts.

2           As the state court explained, it is clear from the guilty verdict returned on the

3    murder conspiracy count that the jury found Prach had a specific premeditated intent to kill.  In

4    other words, the jury found that Prach directly aided and abetted the shooters.  There was thus no

5    reason for the jury to reach the issue of the shooters' voluntary intoxication in connection with

6    the natural and probable consequences theory of aiding and abetting.  Consequently, any error in

7    omitting such instructions on voluntary intoxication did not have a substantial and injurious

8    effect or influence in determining the jury's verdict.  Prach is not entitled to relief.

9                                    VI.  CONCLUSION

10          For the foregoing reasons, the petition for writ of habeas corpus is hereby

11   DENIED.  Because petitioner failed to make a substantial showing of the denial of a

12   constitutional right, a certificate of appealability shall not issue.  *See* 28 U.S.C. § 2253.

13   IT IS SO ORDERED.

14   DATED: November 5, 2010                    *Charlene H. Sorrentino*
                                                CHARLENE H. SORRENTINO
15                                              UNITED STATES MAGISTRATE JUDGE

16

17

18

19

20

21

22

23

24

25

26